IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:02-cv-2366-MSK-PAC

ROBERT W. SCHRIER, M.D.,

      Plaintiff,

v.

THE REGENTS OF THE UNIVERSITY OF COLORADO, a body corporate;
RICHARD D. KRUGMAN, M.D., individually and
in his official capacity as Dean of the School of Medicine
at the University of Colorado at Denver and Health Sciences Center;
JAMES H. SHORE, M.D., individually; and
GREGORY V. STIEGMANN, M.D., in his official capacity as interim Chancellor of the
University of Colorado at Denver and Health Sciences Center.

      Defendants.

---

## THIRD AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

---

Plaintiff Robert W. Schrier, M.D. ("Dr. Schrier"), by his counsel, brings the following

Third Amended Complaint for Injunctive Relief and Damages against the Defendants Board of

Regents of the University of Colorado, Richard D. Krugman, M.D. (individually and in his

official capacity as Dean of the School of Medicine at the University of Colorado at Denver and

Health Sciences Center), and James H. Shore, M.D. (individually), Gregory V. Stiegmann, M.D.

(in his official capacity as Interim Chancellor of the University of Colorado at Denver and Health

Sciences Center):

## PARTIES AND JURISDICTION

1.      Dr. Schrier is a citizen of the state of Colorado.  At all times relevant hereto,

Dr. Schrier was Chair of the Department of Medicine and a tenured Professor of Medicine at the

University of Colorado School of Medicine.  In recognition of his accomplishments as Chairman,

on March 15, 2001, a Post-Tenure Review Committee found that Dr. Schrier "is the most

effective and illustrious chairman of medicine in America today." [Ex. A.]  There are only 126

such positions within medical schools in the United States.

2.      Defendant Regents of the University of Colorado (the "Regents") is a body

corporate and the governing board for the University of Colorado ("University"), an institution of

higher learning.  The University has a School of Medicine located at the University of Colorado

at Denver Health Sciences Center ("UCDHSC"), 4200 East Ninth Avenue in the City and County

of Denver, Colorado.

3.      Defendant Richard D. Krugman, M.D. ("Dean Krugman") is a citizen of the state

of Colorado and Dean of the School of Medicine in the UCDHSC.

4.      Defendant James H. Shore, M.D. ("Dr. Shore") is a citizen of the state of

Colorado and is currently Chancellor of the UCDHSC.  Dr Shore is resigning as Chancellor of

UCDHSC effective December 11, 2005.  Dr. Shore and Dean Krugman are referred to herein

collectively as the "Individual Defendants."

5.     On November 3, 2005, Gregory V. Stiegmann, M.D., was appointed Interim Chancellor of UCDHSC, effective December 11, 2005.[1]

6.     This action was originally filed in Colorado state court against the Regents and Defendants in their official capacities on December 16, 2002.  On December 18, 2002, the Regents and Individual Defendants removed this action to federal court.  By removing this action, the Regents have waived any claim to immunity to suit in federal court that may have otherwise been available under the Eleventh Amendment of the United States Constitution.

7.     This Court has jurisdiction over Plaintiff's claims brought under 42 U.S.C. § 1983 pursuant to 28 U.S.C. § 1331, and over all other claims in this action pursuant to 28 U.S.C. § 1367(a).

8.     This is the district in which the Regents are located, all of the Individual Defendants reside, the contractual services were to be performed, and the tortious conduct occurred.  Therefore, venue is proper pursuant to 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS

9.     Dr. Schrier is a nephrologist, educator, and research investigator of international renown.  He was appointed as Professor of Medicine at the University of Colorado School of Medicine on or about July 1, 1972.  He received continuous tenure and was appointed as Professor of Medicine and Head of the Renal Division, Department of Medicine, on or about July 1, 1972.

----

[1] Once a permanent Chancellor is named, Dr. Schrier will move, pursuant to F.R.C.P. 25(d), to substitute the new Chancellor, in his or her official capacity, as a party to this action.

10.     Effective July 1, 1976, Dr. Schrier was appointed as the Chairman of the Department of Medicine, the largest department in the School of Medicine.  His Chairmanship expressly ran "concurrent with his continuous appointment as Professor of Medicine," as reflected in the Board of Regents' June 23, 1976 meeting minutes.  [Ex. B.]   Under the Laws of the Regents and in practice, continuous appointments may only be terminated for cause.

11.     The University Faculty Handbook incorporates and expressly references sections from the American Association of University Professors' Statement of Principles on Academic Freedom and Tenure (the "Statement of Principles").  [Ex. C.]  The Statement of Principles equates "permanent" and "continuous" positions and acknowledges that "cause" is necessary to terminate "a continuous appointment."  [Ex. D.]  Because of his continuous appointment as Chairman, Dr. Schrier's Chairmanship could only be terminated for cause.

12.     The Chair of the Department of Medicine position is also governed by Appendix B of the Regents' Laws captioned "Roles and Responsibilities of Department Chairs" ("Appendix B").  [Ex. E.]  Section 5 of Appendix B provides the "termination for cause" procedures, which require the Dean's consultation with the department faculty and, in the case of disagreement between the faculty and the Dean, an administrative hearing.  [Ex. E at § 5.]

13.     The Regents made Dr. Schrier's appointment continuous in order to induce a physician/educator of the stature of Dr. Schrier to devote his career and energies to the School of Medicine, to develop the department into one of the premier such departments in the country, and to provide continuity and stability for the largest of the 25 departments in the School of

Medicine.  In performing his duties, Dr. Schrier has gone beyond the reasonable expectations of the Regents.

14.     As Chairman of the Department of Medicine, Dr. Schrier has demonstrated outstanding leadership and results in terms of academic enhancements, clinical programs, facility enhancements, and securing new resources.  Examples of Dr. Schrier's recent success in these categories are as follows:

a.     Dr. Schrier has demonstrated abundant leadership and success as Chairman in recent years in the area of academic enhancements.  For example, under Dr. Schrier's leadership, the Department of Medicine has establishing thirty-named research chairs, which has provided the Department approximately $50 million in endowments — more than any other department in the University.  During the period 1997 through 2002 alone, the Department of Medicine increased its endowed chairs from sixteen to thirty.  During recent years under Dr. Schrier's leadership, the Department of Medicine established a Division of Health Care Policy and Research, Chronic Obstructive Pulmonary Disease Center, Autoimmune Center, Genetic Lung Disease Center, Stem Cell Biology Program, and Experimental Therapeutics and Vascular Biology Program.  The Ph.D. and Certificate Programs in Clinical Science initiated by Dr. Schrier in the Department of Medicine in 1997 continue to thrive, with the students attaining $3.33 million in grant funding (47 grants) and publishing over 200 manuscripts since its inception.

b.     Dr. Schrier's recent clinical leadership is evidenced by the Department of Medicine's outstanding performance in last year's US News and World Report survey of 2000 US

hospitals.  In the survey, the hospitals were ranked in seventeen different subspecialties.  The University of Colorado Hospital ranked in the top fifty in eleven of the seventeen surveyed subspecialties.  Department of Medicine specialty programs accounted for six of these eleven ranked programs.

        c.      As Chairman, Dr. Schrier has demonstrated his support for and success in enhancing the Department and School of Medicine's facilities.  For example, Dr. Schrier allocated $2.4 million in Department of Medicine funds to renovating research laboratories on the current campus.  Furthermore, when Dean Krugman asked Dr. Schrier and Dr. Doug Jones to help raise funds for the next research building at Fitzsimons, Dr. Schrier responded to the request with an outline of a funding plan.

        d.      As Chairman, Dr. Schrier has been successful in bringing new resources to the Department of Medicine.  For example, direct and indirect research funding received by the Department of Medicine faculty increased from $41.6 million in fiscal year 2000/01 to $53.5 million in fiscal year 2001/02, a single year increase of 28%.  Seventy-five percent of all patent royalties over the last five years at the UCDHSC have been generated by Department of Medicine faculty.  Finally, the Department of Medicine accounts for 35% of all National Institutes of Health grants awarded to the School of Medicine, although there are 24 Departments in the School.  Dr. Schrier, as a researcher and principal investigator, has been awarded $13 million in research grants since 1995.

15.     The stability and continuity provided by Dr. Schrier's continuous appointment over the past 26 years has substantially benefitted the University and led to a truly great Department of Medicine.

16.     Throughout his 26-year tenure as Chairman, Dr. Schrier was never reviewed and "reappointed" like other department chairs at the University.  The parties at all times treated Dr. Schrier's Chairmanship as a continuous appointment.

17.     In the last 70 or more years, the Department of Medicine has had only three Chairpersons, each of whom served for lengthy terms.

18.     Dr. Schrier received additional monetary remuneration from the Regents for his work as Chairman.

19.     Dean Krugman has never reprimanded Dr. Schrier or even criticized his job performance as Chairman.  In fact, during his tenure as Chairman of the Department of Medicine, Dr. Schrier has never received a negative performance evaluation.

20.     Throughout his career, Dr. Schrier has authored more than 780 scientific papers and edited 45 texts in internal medicine, geriatrics, drug usage and kidney disease.  He has also received honorary degrees from three universities, including the University; was elected to the Institute of Medicine of the National Academy of Science; is an honorary member of the Royal Society of Physicians; served as President of the Association of American Physicians, International Society of Nephrology, American Society of Nephrology and National Kidney Foundation; and received the highest national award from the American College of Physicians.

The Association of Professors of Medicine honored Dr. Schrier with the Robert Williams Award as outstanding Chair of Medicine. A summary CV for Dr. Schrier is attached as Exhibit F.

21.    In or about May, 2002, through proclamations by Denver Mayor Wellington Webb and Colorado Governor Bill Owens, May 4th was declared to be Dr. Robert Schrier Day, in honor of Dr. Schrier's lifetime achievements in science and medicine. And in June, 2002, Dr. Schrier received the Bonfils-Stanton Award in Science and Medicine for his contributions to nephrology and medicine. Best Doctors has named Dr. Schrier as one of the nation's "Best Doctors" for the last 10 years consecutively. [Ex. G.]

## DR. SCHRIER'S FITZSIMMONS-RELATED SPEECH

22.    During the mid-1990s, a public dialogue began regarding moving the UCDHSC and the School of Medicine from its current location in Denver, Colorado to the site of the then-recently decommissioned Fitzsimons Army Hospital in Aurora, Colorado (the "Fitzsimons move"). The Fitzsimons move is a matter of public interest and concern.

23.    Dr. Schrier has been an active participant in the public dialogue regarding the Fitzsimons move since it was first proposed. By expressing his concerns on matters of public interest and concern regarding the Fitzsimons move, Dr. Schrier exercised his right to free speech under the First Amendment of the United States and Colorado Constitutions, and his right to academic freedom within the University. Dr. Schrier's protected speech included, but was not limited to, written and verbal statements regarding concerns about the allocation to Fitzsimons of money from research grants to buildings rather than retaining and recruiting the best and brightest faculty; concerns about the $600 million debt for the UCDHSC and the University of

Colorado Hospital that the move to Fitzsimons would create; and concerns with respect to how the operation of separate campuses would affect finances and collaboration on grants, research and teaching. One of Dr. Schrier's writings on this subject, the "Chairman's Corner," is attached hereto as Exhibit H.

24.     Nevertheless, Dr. Schrier at all times stood ready to and did completely fulfill his administrative obligations to facilitate the move to Fitzsimons. Several outpatient specialties within the Department of Medicine moved to Fitzsimons with the active and willing cooperation and assistance of Dr. Schrier. At no time was Dr. Schrier insubordinate, nor did he ever disrupt or attempt to block the UCDHSC and University of Colorado Hospital's move to Fitzsimons.

25.     The University and Regents have no legally recognized interest in preventing or suppressing Dr. Schrier's expression regarding the Fitzsimons move.

26.     Dr. Schrier's conduct was consistent with, and in fact authorized by, the Regent Laws, Art. 5(D) entitled "Principles of Academic Freedom." That section defines academic freedom as "the freedom to inquire, discover, publish and teach truth as the faculty member sees it . . . ." Faculty members should not be subject to disciplinary action for the exercise of academic freedom:

> [T]he appointment . . . of faculty members should not be influenced by such extrinsic considerations as political, social, or religious views, or views concerning departmental or university operation or administration. A disciplinary action against a faculty member . . . should not be influenced by such extrinsic consideration.
>                                        * * *
> When speaking or writing as citizens, [faculty members] should be free from university censorship or discipline . . . .

[Ex. I at § 5.D.2(B), (D) (emphasis supplied).]

## TERMINATION AND AFTERMATH

27.     On October 10, 2002, Dean Krugman entered Dr. Schrier's office with a University attorney, Dan Wilkerson.  Dean Krugman had never in the past communicated with Dr. Schrier with legal counsel present.  Dean Krugman refused to allow Dr. Schrier's assistant to be present.  Dean Krugman handed Dr. Schrier a one paragraph letter stating that Dean Krugman was "relieving" Dr. Schrier of his position as Chair of the Department of Medicine "immediately."  [Ex. J.]  The purported discharge as Chair came without warning.

28.     Dr. Schrier's dismissal violated the terms of his continuous appointment and was otherwise inconsistent with and in violation of the University policy and the Laws of the Regents governing such appointments.

29.     Such conduct was and is unlawful, in flagrant disregard of Dr. Schrier's well-established rights, and has caused irreparable injury to his professional reputation and career.

30.     Dr. Shore approved Dean Krugman's action [Ex. J], as did then-President Elizabeth Hoffman.  By approving and ratifying Dr. Schrier's removal as Chairman, Dr. Shore and Dr. Hoffman violated Dr. Schrier's well-established constitutional rights.  Upon information and belief, Dean Krugman, Dr. Shore, former President Hoffman, and other officers of the University of Colorado conspired, aided, and abetted and ratified the wrongful removal of Dr. Schrier as Department Chair.

31.     Dr. Schrier's immediate dismissal, without due process, received publicity nationwide.  It was immediately disseminated nationwide by the American Association of

Medical Colleges ("AAMC"), which consists of deans of the 126 medical schools in the nation.

It also received attention at an international medical conference in Philadelphia, Pennsylvania in

October, 2002. The Rocky Mountain News reported that at the medical conference there was

"general disbelief that Dr. Schrier, respected universally by the community, could be removed

like that . . . .," quoting Dr. Tom Berl, head of the UCDHSC Nephrology Unit. [Ex. K.]

32.     The wrongful removal of Dr. Schrier as Department Chair was motivated and

intended, in whole or in part, to punish and make an example of Dr. Schrier for valid exercise of

his First Amendment rights and his exercise of academic freedom, which is recognized in the

policies of the University and Regents. These rights are clearly established and a reasonable

person would have known of such rights.

33.     Within two days after Dr. Schrier's removal, Associate Dean E. Chester Ridgway,

one of Dean Krugman's chief lieutenants, sent Dean Krugman an e-mail passing on a

communication that "on the national scene everyone agrees ... Dr. S[chrier] is a fossil." A copy

of the e-mail from Associate Dean Ridgway is attached hereto as Exhibit L .

34.     Removal of Dr. Schrier as Chairman of the Department of Medicine was a major

decision affecting the academic welfare of the University requiring collaboration with faculty

before it is undertaken or implemented. Defendants failed to undertake such collaboration,

violating Dr. Schrier's shared governance rights, which are part of his employment contract with

the Regents.

35.     In addition to wrongfully terminating his position as Chair of the Department of

Medicine and/or failing to rectify that wrongful act, the Individual Defendants and the Regents

have violated Dr. Schrier's rights by deliberately making false statements about Dr. Schrier, including but not limited to the following:  (1) that Dr. Schrier is not a "team player" in the context of the move to Fitzsimons; (2) that Dr. Schrier is practicing "guerilla warfare" by attempting to block the move to Fitzsimons; (3) that Dr. Schrier would not allow the Department of Medicine to move to Fitzsimons; (4) that Dr. Schrier attempted to block the housestaff staffing of the Community Hospital at Fitzsimons; (5) that Dean Krugman had asked Dr. Schrier to step down as Department Chair on several occasions; (6) that Dr. Schrier had challenged Dean Krugman's authority; (7) that Dean Krugman and Dr. Schrier had irreconcilable differences; (8) that Dr. Schrier has depleted Departmental reserves; and (9) the Defendants' denial that Dr. Schrier was removed precipitously from his chairmanship because of public statements he had made regarding the move to Fitzsimons.

36.     The statements in the paragraph above are defamatory and injurious to the career and reputation of Dr. Schrier.  Each statement was made by the speaker with actual knowledge that the statement was false at the time it was made or with reckless disregard as to the truth or falsity of such statement.  The statements above violate Dr. Schrier's well-established substantive due process rights.

## STATE OF THE SCHOOL ADDRESS

37.     On October 29, 2002, Dean Krugman delivered the State of the School Address to numerous members of the School of Medicine community.  A copy of the transcript of the State of the School Address is attached hereto as Exhibit M.  The lead subject of the State of the School Address was dedicated to the removal of Dr. Schrier as Chairman of the Department of

Medicine, and throughout this monologue Dean Krugman made numerous false and defamatory statements regarding Dr. Schrier.  [State of the School Address, Ex. M, pp. 1-6.]  The false and defamatory statements in the State of the School Address included:

        a.      Dean Krugman stated that he "first raised the idea of having a new chair in place by July 2003 in 2001, hoping that the two-year period would lead to a peaceful and successful transition that would allow Dr. Schrier to announce his own retirement from the chair and be involved in the transition."  [Ex. M, p. 2 (emphasis added).]  This statement was false and defamatory at the time it was made, and even by Dean Krugman's admission this issue was never raised before April, 2002.

        b.      Similarly, Dean Krugman stated that he and Dr. Schrier "had discussed the need for this change [a new Chair of the Department of Medicine] for more than 18 months." [Ex. M, p. 5.]  This statement was false and defamatory at the time it was made, and, as set forth above, even by Dean Krugman's admission this issue was never raised before April, 2002—only five months before Dr. Schrier's precipitous removal.

        c.      Dean Krugman stated that "over the last several years, a significant number of faculty and division heads (along with department chairs) came to see me privately and told me that they thought it was time for Dr. Schrier to step down." [Ex. M, p. 3.]  This statement was false and defamatory at the time it was made.  By Dean Krugman's own admission, at most only four faculty members—out of approximately 500 faculty in the Department of Medicine—came to Dean Krugman with the concern that he attributes to a "significant number of faculty."  Furthermore, not a single division head—and certainly not

"division heads"—came to Dean Krugman with the stated concern.  Finally, not a single

department chair came to Dean Krugman with the concern that he attributes to an unspecified

number of "department chairs."

        d.      Dean Krugman stated that "several division heads felt they were allowed

no insight into the budget and funds flow in the department over many years."  [Ex. M, p. 3.]

This statement was false and defamatory at the time it was made, and Dean Krugman knew or

should have known that Dr. Schrier provided each division head in his department with extensive

budgetary insight, including semi-annual insight into the division and the department's finances

through the Department of Medicine administrator.

        e.      Dean Krugman stated that the individuals bringing their concerns about

Dr. Schrier to Dean Krugman did not bring such concerns to Dr. Schrier because "[t]hey feared

reprisal."  [Ex. M, p. 3.]  This statement was false and defamatory at the time it was made, and

Dean Krugman knew or should have known that there are no examples of reprisal taken by

Dr. Schrier against faculty members, division heads, or others for bringing concerns to

Dr. Schrier.

        f.      In the State of the School Address, Dean Krugman impugned how the

Department of Medicine was "managed and led" by Dr. Schrier.  [Ex. M, p. 3.]  Dean Krugman

further stated that the Department of Medicine "needs a new vision for its future; it needs

academic, clinical and facility enhancements; it needs new resources." [Ex. M, p. 4.]  In fact,

Dean Krugman knew this statement was false and defamatory at the time it was made, and knew

that Dr. Schrier had provided the Department of Medicine sound leadership and management and brought in unparalleled resources.

g.      Dean Krugman stated that he "do[es] not expect, nor want, chairs to agree with every initiative of the dean or the school, particularly in the discussion stage.  A vigorous debate and widespread discussion among our colleagues leads to better decisions.  Once a decision is made, however, [he] expect[s] chairs to <u>not</u> undermine the School's initiatives, both large and small."  [Ex. M, pp. 3-4 (emphasis in original).]  Through this statement, Dean Krugman knowingly gave the listeners the impression that Dr. Schrier undermined initiatives of the School of Medicine, particularly the Fitzsimons move.  Dean Krugman, however, knew this to be false, and has admitted that Dr. Schrier never undermined any initiative of the School of Medicine, including the move to Fitzsimons.  In fact, Dean Krugman knew that Dr. Schrier had cooperated in the move to Fitzsimons and had taken proactive steps to facilitate the move of certain divisions within the Department of Medicine.

h.      During the State of the School Address, Dean Krugman stated that in April, 2002, he gave Dr. Schrier "the opportunity to make a graceful exit," and that during this alleged conversation, Dr. Schrier asked Dean Krugman when he was "stepping down."  [Ex. M, p. 2.]  Dean Krugman summed up this interaction with Dr. Schrier by stating that his efforts to change the Department of Medicine leadership "in a civilized and respectful way were not only ignored but, in the end, challenged."  [Ex. M, p. 2.]  In fact, no conversation, as described by Dean Krugman in his State of the School Address, ever took place.  Dr. Schrier has never asked Dean Krugman when he was "stepping down" as Dean, nor has Dr. Schrier ever challenged Dean

Krugman's authority.  Dean Krugman knew his statements in this regard were false and defamatory at the time they were made.

        i.      During the State of the School Address, Dean Krugman attempted to justify his surprise, mid-semester termination of Dr. Schrier by stating that "[i]t was also clear to me, and to many who know [Dr. Schrier], that if Dr. Schrier would not resign willingly, he would probably put up a fight regardless of the timing or process that was used." [Ex. M, p. 3.] Through this statement, Dean Krugman knowingly gave the listeners the impression that Dr. Schrier would not, under any circumstances, listen to reason and cooperate in transitioning the Chairmanship.  However, at the time of the State of the School Address, Dean Krugman knew this statement was untrue because Dr. Schrier has already agreed that if Dean Krugman reinstated him as Chairman, he would support an immediate national search for a new Chairman and he would resign upon appointment of the new Chairman.

    38.    Each of the statements set forth in the paragraph above were made by Dean Krugman with actual knowledge on his part of their falsity at the time such statements were made.  Despite knowledge of the actual falsity of such statements, Dean Krugman has refused to retract such statements or publicly correct such false statements.

    39.    Dean Krugman knew that his false statements set forth above would be injurious to Dr. Schrier and his reputation, casting him as one who could not be reasoned with, as one who took retaliatory action against colleagues and subordinates who raised concerns, as one who hid budgetary information, as one who lacked popular support among his colleagues, and as one who would undermine the school's initiatives.

40.     In light of Dean Krugman's years of experience in academic medicine and as Dean of the UCDHSC, Dean Krugman knew or should have known the risk that making the false statements set forth above would cause harm to Dr. Schrier and his reputation.  Notwithstanding the obvious risk of harm to Dr. Schrier, Dean Krugman made the false and defamatory statements set forth above heedlessly and recklessly disregarding the risk of harm to Dr. Schrier.

41.     In addition, Dean Krugman knew that all of the faculty in the School of Medicine were invited to attend and listen to his State of the School Address.  Dean Krugman also knew that the faculty members in attendance at his State of the School Address confer regularly with their colleagues throughout the United States and around the world.  Based on this, Dean Krugman knew or should have known that any false and defamatory statement he made about Dr. Schrier during the State of the School Address would be repeated by those in attendance to individuals throughout the national and international medical community, and, as a result, such defamatory statements would cause grave harm and injury to Dr. Schrier's personal and professional reputation throughout the entire medical community.  Dean Krugman heedlessly and recklessly disregarded this obvious risk of harm to Dr. Schrier and his reputation when he made the false statements set forth above during his State of the School Address.

42.     In further wanton and willful disregard of the harm that his false statements have caused Dr. Schrier, Dean Krugman has refused to publicly retract the false statements or otherwise set the record straight.

## DEFENDANTS BLOCK DR. SCHRIER'S ACCESS TO DUE PROCESS

43.     Prior to commencing this action, Dr. Schrier exhausted his administrative remedies within the Regents' personnel/grievance procedures.  Specifically, on October 28, 2002, Dr. Schrier submitted a grievance to the Faculty Senate Privilege and Tenure Committee.  [Ex. N (without exhibits).]  On November 8, 2002, Margaret Topf, Professor and Chair of the Faculty Senate Privilege and Tenure Committee, advised Dr. Schrier that his grievance is "not under the jurisdiction" of the Committee.  [Ex. O.]  Dr. Topf advised Dr. Schrier that then-President Hoffman would be the arbiter of intra-University conflicts.  While President, Dr. Hoffman publicly stated that the decision to remove Dr. Schrier as Chairman will not be revisited.

44.     The University and its agents' continuing refusal to rectify the wrong done to Dr. Schrier *vis-a-vis* his removal as Chairman and her refusal to afford Dr. Schrier due process constitute on-going deprivations of Dr. Schrier's well-established constitutional rights.

45.     Despite the demands of the forty-six distinguished faculty members of the University's School of Medicine [Ex. P], then-President Hoffman has refused to right the egregious wrong Dean Krugman's precipitous dismissal created.  While President, Dr. Hoffman has advised several individuals protesting Dr. Schrier's dismissal that the decision is "final" and will not be revisited.  [Ex.Q.]  Thus, further exhaustion of administrative remedies by Dr. Schrier would be futile.

46.     On December 16, 2002, Dr. Schrier, through counsel, sent a letter to the Attorney General and University Counsel notifying them of the claims asserted in this Second Amended Complaint. [Ex. R.]  This letter complied with and fulfilled the requirements of Colo. Rev. Stat.

§ 24-10-109.  No response from the State, University, or Regents was received within the ninety (90) days allotted by Colo. Rev. Stat. § 24-10-109(6).

47.     Prior to commencing this action, Dr. Schrier also exhausted his administrative remedies with respect to his age discrimination claim.  On or about April 9, 2003, Dr. Schrier jointly filed a Charge of Discrimination with the EEOC and the Colorado Civil Rights Division, alleging, inter alia, age discrimination in violation of Colo. Rev. Stat. § 24-34-402.  A copy of the Charge of Discrimination is attached hereto as Exhibit S.  During the course of the investigation, additional information was provided to the investigating agency and a copy of this correspondence is attached hereto as Exhibits T and U.  By letter dated July 3, 2003, the investigating agency informed Dr. Schrier that the investigation was being terminated and issued its right-to-sue letter.  A copy of this right-to-sue letter is attached hereto as Exhibit Y.  Thus, Dr. Schrier's age discrimination claim is timely.

48.     All conditions precedent to the maintenance of this action have been performed or have occurred.

49.     Defendants' actions were wanton and willful.

50.     As a result of his termination as Chairman of the Department of Medicine and the false statements published in the wake of his termination, Dr. Schrier has fallen from consideration as candidate for several high level administrative positions in academic medicine at other prestigious institutions.

51.     As a result of the Defendants' actions, Dr. Schrier has suffered severe emotional distress.

## FIRST CLAIM FOR RELIEF
### (Injunctive Relief for Deprivation of Rights in Violation of 42 U.S.C. § 1983—Against Interim Chancellor Stiegmann and Dean Krugman, in Their Official Capacities)

52.     Dr. Schrier incorporates the preceding paragraphs of his Third Amended Complaint as if fully set forth herein.

53.     Dr. Schrier's speech was and is protected by the First Amendment to the United States Constitution, the Colorado Constitution, and the Regents' policy governing academic freedom.  Dr. Schrier's exercise of his constitutional right to free speech and his right to academic freedom was a substantial or motivating factor in the decision to terminate his Chairmanship and to retaliate against him.

54.     Dr. Schrier has a property interest in his professional reputation and in his continued employment as Chair of the Department of Medicine by virtue of his continuous appointment to that position and the protections afforded in the policies and procedures of the University and the School of Medicine, as well as the Laws of the Regents.

55.     Due to Dr. Schrier's continuous appointment as Chairman of the Department of Medicine, Defendants agreed to remove Dr. Schrier from his Chairmanship only for cause and only after affording him the termination for cause procedures provided in Section 5, Appendix B of the Regents' Laws, which include a concurrence of the faculty and, if no concurrence can be achieved, a full hearing.

56.     Defendants did not follow the termination for cause procedures provided in Section 5, Appendix B of the Regents' Laws, which applied to Dr. Schrier's continuous Chairmanship.  By doing so, Defendants have deprived Dr. Schrier of a property interest without due process.

57.     Defendants have deprived Dr. Schrier of his constitutional right to free speech and his right to academic freedom by terminating him in retaliation for exercising these rights.  By terminating Dr. Schrier and by making defamatory statements about him, Defendants have deprived Dr. Schrier of property and liberty interests without due process of law.

58.     By continuing to refuse to reinstate Dr. Schrier as Chairman, afford him due process, or retract the defamatory statements, the deprivation of Dr. Schrier's constitutional rights alleged herein is ongoing.

59.     Defendants' acts as alleged herein were made under color of law.

60.     The foregoing actions of the Defendants have caused Dr. Schrier irreparable injury to his liberty and property interests as Chair of the Department of Medicine, all of which entitle Dr. Schrier to the injunctive relief.

61.     The granting of injunctive relief will be in the public interest.

## SECOND CLAIM FOR RELIEF
### (Damages for Deprivation of Rights in Violation of 42 U.S.C. § 1983—Against Dr. Shore and Dean Krugman, in Their Individual Capacities)

62.     Dr. Schrier incorporates the preceding paragraphs of his Third Complaint as if fully set forth herein.

00245078 / 1

-21-

63.     Under well-established principles and law, Dr. Schrier's speech was and is protected by the First Amendment to the United States Constitution, the Colorado Constitution, and the University's policy governing academic freedom.  Dr. Schrier's exercise of his constitutional right to free speech and his right to academic freedom was a substantial or motivating factor in Dean Krugman and Dr. Shore's decision to terminate his Chairmanship, refusal to reinstate him or afford him due process, and to retaliate against him.

64.     Dr. Schrier has a property interest in his professional reputation and in his continued employment as Chair of the Department of Medicine by virtue of his continuous appointment to that position and the protections afforded in the policies and procedures of the University, the School of Medicine, and the Laws of the Regents.

65.     Due to Dr. Schrier's continuous appointment as Chairman of the Department of Medicine, he could only be lawfully removed  from his Chairmanship for cause and only after being afforded the termination for cause procedures provided in Section 5, Appendix B of the Regents' Laws, which include a concurrence of the faculty and, if no concurrence can be achieved, a full hearing.

66.     Based on the Regents' statement regarding academic freedom, Dr. Schrier could not be lawfully removed as Chairman in retaliation for speaking on issues of public concern or University policy.

67.     Dr. Shore and Dean Krugman did not follow the termination for cause procedures provided in Section 5, Appendix B of the Regents' Laws, which applied to Dr. Schrier's continuous Chairmanship.  By doing so, Dr. Shore and Dean Krugman have deprived Dr. Schrier of a property interest without due process.

68.     Dr. Shore and Dean Krugman have deprived Dr. Schrier of his well-established constitutional right to free speech and his well-established right to academic freedom by terminating him in retaliation for exercising these rights.  By unlawfully removing Dr. Schrier and by making false and defamatory statements about Dr. Schrier, Dr. Shore and Dean Krugman have deprived Dr. Schrier of well-established property and liberty interests without due process of law.

69.     At the time of the events alleged herein, Dr. Schrier's free speech, academic freedom, and due process rights were clearly established constitutional rights of which a reasonable person would have known and of which Dr. Shore and Dean Krugman did know or should have known.

70.     Dr. Shore and Dean Krugman's acts as alleged herein were made under color of law.

71.     The foregoing actions of Dr. Shore and Dean Krugman have caused Dr. Schrier damages in an amount that will be proven at trial.

## THIRD CLAIM FOR RELIEF
### (Age Discrimination in Violation of Colo. Rev. Stat. § 24-34-402 — Against the Regents)

72.     Dr. Schrier incorporates the preceding paragraphs of his Third Amended Complaint as if fully set forth herein.

73.     Dr. Schrier, who was 66 years of age at the time of his discharge as Chairman of the Department of Medicine, belongs to the protected class of those protected from employment discrimination based upon age.

74.     At the time of his discharge as Chairman of the Department of Medicine, Dr. Schrier was eminently qualified for that position, and was in fact meeting and exceeding the expectations for the position of Chairman of the Department of Medicine.

75.     Despite Dr. Schrier's qualifications and performance as Chairman of the Department of Medicine, he suffered an adverse employment decision when he was terminated from his position as Chairman of the Department of Medicine on October 10, 2002.

76.     The circumstances surrounding Dr. Schrier's termination as Chairman of the Department of Medicine give rise to inference that he was unlawfully removed from that position due to his age.  Such circumstances include, but are not limited to, the following:

        a.      When asked to explain the rationale for his precipitous termination of Dr. Schrier, Dr. Krugman has repeatedly stated that, "It was just time." [See, e.g., State of the School Address, Ex. M, p. 5.]

b. Dean Krugman has further explained that he wanted a change in the Chairmanship because he wants to give a new Chair "the opportunity to build their [sic] own legacy."

c. Within two days of Dr. Schrier's removal, Associate Dean Ridgway, one of Dean Krugman's chief lieutenants, e-mail's Dean Krugman: "I had an interesting conversation with an immunologist at Michigan. . . .  He says on the national scene everyone agrees ... [Dr.Schrier] is a fossil." [Ex. L (second ellipse in original).]

d. At 66 years of age, Dr. Schrier was the oldest department chair at the UCDHSC.

77. These statements and circumstances, together with Dr. Schrier's outstanding performance and the absence of any negative performance evaluations, give rise to the inference that Dr. Schrier was unlawfully removed as Chairman of the Department of Medicine due, at least in part, to his age.  Any explanation to the contrary is pretextual.

78. All of the candidates considered to fill the Chairmanship vacancy were younger than Dr. Schrier, as was the individual ultimately selected to fill the vacancy.

79. Dr. Schrier has suffered economic, emotional, and non-economic damages as a result of his unlawful removal as Chairman of the Department of Medicine.

80. In addition to other relief permitted by law, Dr. Schrier is entitled to an order in his favor and against the Regents for back-pay and reinstatement as a result of the Regents' unlawful conduct.

**FOURTH CLAIM FOR RELIEF**
**(Breach of Contract— Against the Regents)**

81.     Dr. Schrier incorporates the preceding paragraphs of his Third Complaint as if

fully set forth herein.

82.     When Dr. Schrier received his continuous appointment as Chairman of the

Department of Medicine, the parties agreed and understood that he could only be terminated for

cause and was not required to be re-appointed during his tenure.  Furthermore, University

policies, School of Medicine policies, and the Laws of the Regents, to the extent they were not

inconsistent with the terms of Dr. Schrier's appointment, became part of his contract governing

his appointment as Chairman.  Dr. Schrier reasonably relied on the foregoing understanding, and

the conduct of the parties has been consistent therewith.

83.     Furthermore, the "Principles of Academic Freedom" set forth in the Faculty

Handbook, and as typically applied by the Regents and as understood within the University

community, form part of the contractual agreement between Dr. Schrier, as Chair of the

Department of Medicine, and the Regents.  The Regents bound themselves to follow their

principles of academic freedom and to not retaliate and discipline Chairs and other faculty

members who exercise such agreed-upon academic freedoms.

84.     Article 5 of the Regent Laws expresses a fundamental principle that forms a part

of Dr. Schrier's contractual agreement with the University.  Article 5.E.5 states the following: "It

is a guiding principle of shared governance recognized by the Board of Regents that the faculty

and the administration shall collaborate on major decisions affecting the academic welfare of the

University."  Attempts to terminate Dr. Schrier's position as Chair are the type of "major decisions" that require collaboration with the faculty.  In a wilful and wanton disregard of Dr. Schrier's rights, the Defendants refused to collaborate with the faculty before they attempted to terminate Dr. Schrier's chairmanship.

85.     The Regents have breached Dr. Schrier's Contract with the Regents and the mutual understanding of the parties by terminating him as Chairman.

86.     The foregoing actions of the Regents have caused Dr. Schrier damages in an amount that will be proven at trial and furthermore have caused him irreparable injury to his professional reputation and property interests as Chair of the Department of Medicine, all of which entitle Dr. Schrier to the injunctive relief.  Such injunctive relief is in the public interest.

### FIFTH CLAIM FOR RELIEF
**(Defamation *Per Quod* — Against Dean Krugman)**

87.     Dr. Schrier incorporates the preceding paragraphs of his Third Amended Complaint as if fully set forth herein.

88.     Dean Krugman published numerous false and defamatory verbal statements about Dr. Schrier, including statements made during the State of the School Address.  The content of these false and defamatory statements are set forth above and incorporated herein by reference.

89.     The false and defamatory verbal statements about Dr. Schrier made by Dean Krugman during the State of the School Address, were reduced to writing and published when Dean Krugman published or caused to be published the script of his State of the School Address. [See Ex. M.]

90.     The numerous individuals who heard or read Dean Krugman's false and defamatory statements about Dr. Schrier understood such statements to be defamatory.

91.     The false and defamatory statements were about Dr. Schrier.

92.     The substance and gist of the statements were false at the time they were published.

93.     At the time Dean Krugman published the false and defamatory statements about Dr. Schrier, Dean Krugman knew the statements were false or, at the very least, acted with reckless disregard as to whether such statements were false or not.

94.     As set forth above and incorporated herein by reference, at the time Dean Krugman published the false and defamatory statements about Dr. Schrier, Dean Krugman knew the false statements would be injurious to Dr. Schrier, and Dean Krugman made the false statements with heedless and reckless disregard for the risk posed to Dr. Schrier.

95.     Due to Dean Krugman's publication of false and defamatory statements, Dr. Schrier has suffered economic, emotional, and non-economic damages.

## SIXTH CLAIM FOR RELIEF
### (Defamation *Per Se* — Against Dean Krugman)

96.     Dr. Schrier incorporates the preceding paragraphs of his Third Amended Complaint as if fully set forth herein.

97.     The libelous and slanderous defamatory statements published by Dean Krugman, as set forth above and incorporated herein by reference, were defamatory of Dr. Schrier's professional and business conduct and reputation as an administrator in academic medicine.

98.     No extrinsic evidence is required to show that the referenced statements are defamatory to Dr. Schrier in his profession and business of being an administrator in academic medicine.

99.     The libelous and slanderous defamatory statements published by Dean Krugman tend to harm Dr. Schrier's reputation as a first-rate administrator in academic medicine and tend to deter third persons from associating with Dr. Schrier in the academic medical community and otherwise.

100.     As set forth above and incorporated herein by reference, at the time Dean Krugman published the false and defamatory statements about Dr. Schrier, Dean Krugman knew the false statements would be injurious to Dr. Schrier and his professional reputation, and Dean Krugman made the false statements with heedless and reckless disregard for the risk posed to Dr. Schrier.

WHEREFORE, Dr. Schrier prays for the following relief:

A.     Judgment against the individual Defendants Stiegmann and Krugman, in their official capacities, and in favor of Dr. Schrier on the First Claim for Relief;

B.     Judgment against Defendants Shore and Krugman, in their individual capacities, and in favor of Dr. Schrier on the Second Claim for Relief;

C.     Judgment against the Regents and in favor of Dr. Schrier on the Third and Fourth Claims for Relief;

D.     Judgment against Dean Krugman, in his individual capacity, and in favor of Dr. Schrier on the Fifth and Sixth Claims for Relief.

E.      Injunctive relief ordering Defendants Stiegmann and Krugman, in their official

capacities, to reinstate and restore Dr. Schrier forthwith to his Chairmanship, and all of the rights

and privileges associated therewith;

F.      Injunctive relief enjoining and prohibiting Defendants Stiegmann and Krugman,

in their official capacities, from removing or attempting to remove Dr. Schrier from his

Chairmanship, unless such removal is accomplished under the for cause removal provisions for

Department Chairs, as set forth in Section 5 of Appendix B of the Regents' Laws, and;

G.      Damages from each Defendant as allowed by law and in amounts to be

determined at trial;

H.      Attorneys' fees, expert witness fees, costs, and expenses as provided by law; and

I.      Such other and further relief as the Court deems just and appropriate.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Dated this 11th day of November, 2005.

/s/   Craig R. Welling
*Craig R. Welling*
Rothgerber Johnson & Lyons LLP
1200 17th Street, Suite 3000
Denver, Colorado 80202
Telephone:  (303) 623-9000
FAX:  (303) 623-9222
Email: cwelling@rothgerber.com
*Attorneys for Plaintiff Robert W. Schrier, M.D.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of November, 2005, I electronically filed the foregoing (including Exhibits A through V) with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

David P. Temple, Esq.          Email: David.Temple@cudenver.edu

Thomas S. Rice, Esq.           Email: trice@sgrllc.com

Gillian M. Flener, Esq.        Email: gflener@scrllc.com


/s/  Craig R. Welling
**Craig R. Welling**
Rothgerber Johnson & Lyons LLP
1200 17th Street, Suite 3000
Denver, Colorado 80202
Telephone:  (303) 623-9000
FAX:  (303) 623-9222
Email: cwelling@rothgerber.com
*Attorneys for Plaintiff Robert W. Schrier, M.D.*